Argued December 14, 1943; affirmed January 18, 1944

## NORTHWEST ADJUSTMENT CO. *v.*
## PAYNE ET AL.

(144 P. (2d) 718)

Before BAILEY, Chief Justice, and ROSSMAN, KELLY, LUSK, and BRAND, Associate Justices.

*Wilber Henderson,* of Portland (Platt, Henderson, Warner, Cram & Dickinson, of Portland, on the brief) for appellant.

*Philip A. Joss,* of Portland (Reynolds, Flegel & Smith, of Portland, on the brief) for respondents.

*Dana E. Brinck* and *Fred A. Knutsen,* both of Spokane, Wash., *amici curiae* for Federal Farm Mortgage Corporation and Federal Land Bank of Spokane.

BAILEY, C. J.   This action was instituted by Northwest Adjustment Company, a corporation, against W. E. Payne, John Payne, Esther Long and Hazel Payne, to recover judgment on a note for $700 dated April 15, 1936, signed by the defendants, payable to United States National Corporation and assigned by the latter corporation to the plaintiff for collection. From a judgment in favor of W. E. Payne and Hazel Payne, the only defendants who appeared or were served in the case, the plaintiff appeals.

The note involved in this action is the last of a series of renewal notes. On or about December 26, 1933, the defendants made, executed and delivered to Clark County National Bank of Vancouver, Washington, their promissory note for $893.34, due ninety days after date, with interest at the rate of eight per cent per annum. That note was transferred to United

States National Corporation, which took it with notice of the conditions under which it was executed and was not a holder in due course. On April 20, 1934, there was paid on the note the sum of $93.34, with accrued interest, and a renewal note was executed by the defendants for $800, payable to United States National Corporation. Other renewal notes were executed and payments were made on principal and interest from time to time until the principal was reduced to $700.

When the original note of $893.34 was executed and delivered by the defendants to Clark County National Bank, Frank E. Payne, the father of the defendants, was the owner of approximately 120 acres of land in Clark County, Washington, on which there was a first mortgage in favor of the Federal Land Bank of Spokane, Washington, securing indebtedness in an amount not disclosed. Frank E. Payne also owed Clark County National Bank $2,500 and interest, evidenced by a promissory note dated April 17, 1933. In addition, he was indebted for delinquent taxes, chattel mortgages to the federal government, $326.70 owing to Stoller Motor Company and $1,434.69 owing to Lewis Shattuck.

On or about August 4, 1933, Frank E. Payne applied to the land bank commissioner for a second mortgage loan on his farm in the sum of $3,500; and on November 15, 1933, the commissioner by his agent, the Federal Land Bank of Spokane, approved a second mortgage loan of $4,000, subject to the requirement that all debts of the borrower be consolidated except the debt to the Federal Land Bank of Spokane, which was secured by a first mortgage on the farm.

The amount of the debts which had to be satisfied out of the loan exceeded $4,000, and Mr. Payne took

up with the Clark County National Bank and the two individual creditors above named the question of settling their claims for less than the respective amounts due them. The creditors agreed to scale down their claims so as to bring the aggregate within the amount allotted thereto in the debt consolidation schedule.

Under date of December 26, 1933, Clark County National Bank filled out and signed a printed form addressed to the Federal Land Bank of Spokane. The form referred to the application of Frank E. Payne [for a loan] and stated that Clark County National Bank had a claim against Payne in the sum of $2,500 and interest thereon at the rate of eight per cent per annum from April 17, 1933, evidenced by a promissory note. The form as completed then continued as follows:

> "I agree to accept the sum of $1750.00 net in full satisfaction of said claim if paid within 60 days after this date; or if paid thereafter, with interest on said sum at 8% per annum from the expiration of said period. Payment of this amount should be made by check payable to Clark County National Bank and forwarded to Clark County National Bank of Vancouver, Wash.; and all evidence of such indebtedness, together with a properly executed release of said encumbrance, will be delivered to you upon making said payment. I further agree that directly or indirectly no note, mortgage, or other consideration has been or will be received from the debtor incident to such acceptance, other than the amount named in this paragraph; and that when said consideration is paid all of my claims against the said debtor will have been satisfied in full. No person, firm or corporation other than the undersigned is the owner of any interest in said indebtedness."

At the bottom of the form the following appears in large type:

"IMPORTANT NOTICE! *One of these forms* MUST *be fully completed by any one who is to receive any payment from loan proceeds and returned to this Bank; otherwise the loan can not be closed."*

The completed form was delivered to and received by the Federal Land Bank on December 28, 1933. On the same date, similar forms filled out by Stoller Motor Company and Shattuck, agreeing to accept less than the amounts due them respectively, were received by the Federal Land Bank.

Thereafter it was ascertained that the amount available for payment of the three claims as reduced was insufficient; and the claims were further reduced, with the result that the amount finally agreed to be accepted by the Clark County National Bank in full satisfaction of its claim was $1,475. The three claims as so reduced were paid by the Federal Land Bank as agent of the land bank commissioner. Upon receiving payment of $1,475, the Clark County National Bank marked the $2,500 note of Frank E. Payne as paid and delivered it to the Federal Land Bank.

During those negotiations and apparently after the Clark County National Bank agreed to reduce its claim to $1,750, the defendant W. E. Payne, at the request of his father, went to that bank and procured from W. B. Gard, cashier, a promissory note form to be signed by himself and the other defendants, his brother and sisters. He took the note home and on Christmas day, 1933, at the request of their father the four defendants signed it. On the following day it was delivered by W. E. Payne to Mr. Gard. At that

time the note was undated and the maturity date had not been inserted. The blanks were filled in by Mr. Gard or some other employee of the bank. The principal of the note was $893.34, which was the difference between the principal of the $2,500 note and interest thereon and the $1,750 which the Clark County National Bank contemplated receiving from the Federal Land Bank.

Asked what explanation his father gave him and the other defendants for requesting them to sign the note, W. E. Payne testified as follows:

"A. Well, he told me that the bank required that us four children give them a note in the amount of the scale down; being that they couldn't take a note from him they asked that us four children give them a note for the amount of the scale down in return for the surrender of the original.

\* \* \* \* \* \*

"Q. Was there any discussion had with your father as to how the note was to be paid?

"A. There was.

"Q. What was that? Now, this was beforehand?

"A. Yes. He told me that he would pay the note.

"Q. Did your father have any other property other than the farm and its equipment at that time?

"A. No."

After stating that the note was executed on Christmas day, W. E. Payne gave the following testimony:

"Q. Did you have any discussion with the other children or with your father at that time?

"A. We did.

"Q. Tell the nature of that.

"A. Well, we discussed the signing of this note with my father. He assured us that we would have no fear of having to pay the note; that it was his

obligation. The reason we were giving it was because he was unable to under the law, and that as times got better and we got a prune crop and sold it that he would pay the note.

"Q. Now, did he ask you to make a gift to him of that note?

"A. He did not.

"Q. Had you ever given your father money in the past?

"A. Heck, no."

When W. E. Payne went to the Clark County National Bank to get the note form he had a conversation with Mr. Gard, the cashier. In answer to a question as to the nature of that conversation he testified as follows:

"A. Well, I asked him why they wanted us four children to give him the note, why he didn't take one from my father. He told me that they were prohibited by law from doing that and that they had to have some evidence of the indebtedness; that they would look solely to him for payment of it, proceeds of the farm; that we wouldn't be asked personally to pay the note.

"Q. When you say 'we wouldn't be asked personally' to pay for it, who do you mean by 'we'?

"A. My two sisters, my brother, and I.

"Q. When you said he would pay for it, who did you mean?

"A. My father."

Mr. Gard, called as a witness by the plaintiff, did not deny having had the conversation with W. E. Payne concerning which the latter testified.

Hazel Payne testified that she had no conversation with any one connected with the Clark County National Bank about signing the note. She stated that she was not indebted to that bank; that she had not signed the note as a gift to her father; and that at the time

she signed the instrument, "My father explained to me that he would take care of this note on the farm; that we would not be held, any one of us, responsible."

When the original note for $893.34 was signed, Mr. Gard did not inquire of W. E. Payne as to his financial condition or that of any of the other signers. At that time W. E. Payne and his brother were living on their father's farm and working for him. Hazel Payne held a stenographic position in Portland and her sister, Esther, was unemployed.

After the Clark County National Bank agreed to scale down its compromise claim of $1,750 against Frank E. Payne to $1,475, it prepared another note, for $286, representing the amount of the second reduction and interest accrued, and delivered it to W. E. Payne to be signed by him and his brother and sisters. It was never executed by them.

The loan of $4,000 as approved was made by the land bank commissioner through his agent, the Federal Land Bank of Spokane, to Frank E. Payne sometime in January, 1934, and was secured by a second mortgage on the borrower's farm. Mr. Payne died in the following month, and his four children inherited his real property.

The making of a loan such as that to Mr. Payne was described in the testimony of J. M. McKay, which was taken by deposition. He stated that he was employed by the Federal Land Bank of Spokane "as manager of the closing division"; that during the years 1933 and 1934 he "closed or supervised the closing of all loans made by the Federal Land Bank of Spokane and all loans made by the bank as agent of the land bank commissioner". He further testified that, "Consolidation of debts means that all the debts of a borrower,

except such as are specifically exempted, shall be satisfied in full when the loan is closed, so that the borrower will owe no debts except under his mortgage to the land bank commissioner, except to any exempted creditor, which in this case was the Federal Land Bank of Spokane.''

Mr. McKay also stated that when he closed the loan to Frank E. Payne he did not know ''that any note had been executed by third persons for any difference between what was paid to the Clark County National Bank and the amount of the debts held by it''; and that, had he known that fact, he ''could not have disbursed the moneys under the instruction'' he had ''and would not have done so''.

Mr. Gard testified that the composition agreement hereinabove discussed and quoted in part was not executed by the Clark County National Bank until after the note for $893.34 was delivered to it.

The circuit court made special findings on all the issues involved in the case, all of which findings were sustained by substantial evidence. It found among other things that the four children of Frank E. Payne in executing the note for $893.34 were not making a gift of the amount thereof to their father; and that it was agreed between the signers of that note and the Clark County National Bank, as well as between the signers and their father, Frank E. Payne, that the note was to evidence ''a portion of their father's indebtedness to the Clark County National Bank, and that said note was the obligation of said Frank E. Payne to be paid by him from the earnings of his said farm.'' It was further found by the court that the Clark County National Bank agreed with the Federal Land Bank of Spokane that it would accept $1,475 in full satisfaction

of its claim against Frank E. Payne of $2,500 and interest and that upon payment of the $1,475 the Clark County National Bank would deliver to the Federal Land Bank all evidence of such indebtedness.

In addition, the circuit court found that neither the Federal Land Bank nor the land bank commissioner had knowledge or notice at the time of closing the loan to Frank E. Payne that the Clark County National Bank had received from Payne's children the note above mentioned; and that the loan was made by the Federal Land Bank to Payne in reliance upon the representations and agreement of the Clark County National Bank that it would receive the $1,475 of federal funds in full settlement of its claim against Payne.

It was also found that the note for $893.34 "was executed and taken by said Clark County National Bank of Vancouver, Washington, as part of a secret scheme to defraud and in fraud upon said Federal Land Bank commissioner and upon said other creditors of said Frank E. Payne, and was a fraudulent subterfuge to endeavor to do indirectly what it could not accomplish directly; that it was an endeavor on the part of said Clark County National Bank ... to secretly and unlawfully circumvent the requirements of the Emergency Farm Mortgage Act of 1933 and the conditions of Federal Land Bank commissioner's loans, while accepting the benefits thereof"; and that "in executing and delivering said written agreement dated December 26, 1933, with the Federal Land Bank of Spokane, said Clark County National Bank was guilty of material, false representations, which it knew said Federal Land Bank would rely upon, in that said promissory note ... violated the representations and

agreements therein contained, and the Federal Land Bank commissioner's loan was impaired as a result of the misrepresentations.''

It is the contention of the answering defendants that the note for $893.34 and the renewal note here involved were void because exacted under conditions violative of public policy and the spirit and purpose of the Emergency Farm Mortgage Act of 1933. They assert that the ruling of this court in *Oregon & Western Colonization Company v. Johnson,* 164 Or. 517, 102 P. (2d) 928, is a bar to recovery by the plaintiff in this case.

The Emergency Farm Mortgage Act was passed by Congress on May 12, 1933 (chapter 25, §32, 48 Stat. 48). As subsequently amended it is codified as 12 U.S.C.A., §§ 1016 to 1019, inclusive. For convenience we shall make use of this latter citation, inasmuch as the amendments, enacted after the loan here involved was made, have no bearing on the issues before us. The act authorizes the land bank commissioner to make loans for the purpose of refinancing any indebtedness, secured or unsecured, of any farmer as therein defined: 12 U. S. C. A., § 1016 (e). Loans so made are required to be "secured by a first or second mortgage upon the whole or any part of the farm property, real or personal, including crops, of the farmer": 12 U. S. C. A., § 1016 (a).

In *Oregon & Western Colonization Company v. Johnson,* supra, concerning the act cited this was said:

" . . . This enactment was a relief measure passed at a time of economic depression and in a great national emergency to enable farmers struggling under the load of oppressive debt to save their farms and rehabilitate themselves financially. In

the administration of the law it became necessary, or was deemed advisable, in many instances to require creditors of the farmer to scale down their indebtedness as a condition of granting the loan, and this for two reasons, as pointed out by the court in O'Neil v. Johnson, 29 Fed. Supp. 307; namely, to protect the Federal Land Bank's financial position as the new creditor of the farmer, who had found it impossible to continue operations under his previous load of debts, and to extend relief to the farmers and enable them to work out their salvation. * * * Obviously, where creditors enter into agreements with the Federal Land Bank to scale down their claims, and the loan is authorized and made on the faith of such agreements, a creditor who collusively or secretly obtains from his debtor a promissory note for the difference between the amount paid the creditor from the proceeds of the loan and the full amount of his claim, is flouting the policy of the law. And the courts, therefore, have, in a practically unbroken line of decisions, held promissory notes and other agreements given under such circumstances to be void and unenforceable.''

The decision from which we have just quoted is cited and followed in these cases: *Bilgore v. Gunn,* 150 Fla. 799, 9 So. (2d) 184; *Anderson v. Nelson,* 110 Colo. 374, 134 P. (2d) 1053; *Robinson v. Reynolds,* 194 Ga. 324, 21 S. E. (2d) 214; *May v. Whitbeck,* 111 Mont. 568, 113 P. (2d) 332.

The plaintiff does not question the correctness of the ruling in *Oregon & Western Colonization Company v. Johnson,* supra, but argues that the facts in that case differ materially from those now before us. In the case cited, the plaintiff points out, the debt which was refinanced was secured by a mortgage on real property and the note which was the subject of litigation was

executed by the debtor himself, whereas in the case at bar the claim of the Clark County National Bank was unsecured and the note involved was signed by others than the debtor.

In its brief the plaintiff states that, ''The particular section of the Federal Land Bank law which defines who may be a borrower under the act as of the time in question'' is 12 U. S. C. A., § 1016 (d), which reads as follows:

> ''No loan shall be made under this section unless the holder of any prior mortgage or instrument of indebtedness secured by such farm property arranges to the satisfaction of the land bank commissioner to limit his right to proceed against the farmer and such farm property for default in payment of principal.''

■■ The provision quoted, in our opinion, has no application whatever except in those instances in which the loan to be made by the land bank commissioner is to be secured by a second mortgage on the farm property. In such cases the law prohibits the making of the loan until the holder of the prior mortgage or other instrument of indebtedness limits his right to proceed against the farmer and the farm property, by some arrangement satisfactory to the land bank commissioner. The Emergency Farm Mortgage Act expressly grants to the land bank commissioner authority to refinance any indebtedness, secured or unsecured, of the farmer: 12 U. S. C. A., § 1016 (e); *Oregon & Western Colonization Company v. Johnson,* supra.

■ Frank E. Payne's sons and daughters signed the note for $893.34 and the renewals thereof for the accommodation of their father. It is the general rule that when an accommodation maker is required to pay the

note he may recover from the party accommodated the amount so paid by him: *May v. Whitbeck,* supra; *Leonard v. State Exchange Bank,* 236 F. 316, 319; *Ruvenacht v. German-American Bank,* 287 Ill. 266, 122 N. E. 469; *Means v. Merchants State Bank,* 97 Kans. 748, 156 P. 701; *Morgan v. Thompson,* 72 N. J. L. 244, 62 A. 410; *Wheeler v. Young,* 143 Mass. 143, 9 N. E. 531; annotation, 77 A. L. R. 668; 8 Am. Jur., Bills and Notes, § 466, page 213; 11 C. J. S., Bills and Notes, 750, page 314. The accommodation makers of the note in this instance could, upon being compelled to pay the note, have recovery therefor from their father, unless precluded by considerations of public policy on account of their participation in the Clark County National Bank's secret scheme to circumvent its agreement with the Federal Land Bank.

■ In the document addressed to the Federal Land Bank and signed by the Clark County National Bank the latter bank stated: "I further agree that directly or indirectly no note, mortgage, or other consideration has been or will be received from the debtor incident to such acceptance, other than the amount named in this paragraph". By exacting and receiving the note for $893.34 the Clark County National Bank violated its agreement. The note was "other consideration" than the $1,475 that the bank was to accept in settlement of its claim.

■ After referring in the above-mentioned document to its claim against Frank E. Payne as amounting to $2,500 with interest at eight per cent from April 17, 1933, the Clark County National Bank therein stated: "I agree to accept the sum of $1,475 [replacing the sum of $1,750 theretofore agreed upon] net in full satisfaction of said claim if paid within sixty days after

this date''. The stipulated amount was paid to that bank by the Federal Land Bank within the sixty days specified. Upon receipt of that payment by the Clark County National Bank, the debt of Frank E. Payne to the bank was fully discharged. The Clark County National Bank ''was under no obligation to scale its claim but when it sought to circumvent the purpose of the federal loan, it adopted methods and means inhibited by public policy and may not have recovery in this action'': *International Harvester Company v. Young,* 288 Mich. 436, 285 N. W. 12.

The entire transaction involving the execution of the note was violative of the purpose and spirit of the Emergency Farm Mortgage Act and therefore against public policy. Consequently, the note so executed was void. See, in this connection: *May v. Whitbeck,* supra; *O'Neil v. Johnson,* 29 F. S. 307, and *International Harvester Company v. Young,* supra.

■ The defendants W. E. Payne and Hazel Payne by their answers put in issue the validity of the original note and, in our opinion, laid ample foundation for the introduction of parol evidence of the conditions under which they and their brother and sister signed the note: § 2-214, O. C. L. A.

The judgment appealed from is affirmed.